UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEWISH WAR VETERANS OF THE
UNITED STATES OF AMERICA, INC.,
et al.,

      Plaintiffs,

          v.                    Misc. Nos. 07-220, 07-221, 07-222 (JDB)

ROBERT M. GATES,
Secretary of Defense, in his official capacity,

      Defendant.

## MEMORANDUM OPINION

A large, concrete Latin cross has stood atop Mt. Soledad in San Diego, California for over fifty years. For almost the last twenty of those years, the cross and the veterans memorial of which it is now a part have been the subject of extensive litigation in the federal and state courts, as well as numerous legislative initiatives by local officials. Those legislative efforts shifted to the federal level in 2004, culminating in legislation through which the United States government first designated the Mt. Soledad Veterans Memorial as a national memorial honoring members of the U.S. Armed Forces, and then later acquired the Memorial. See Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Div. J., Title I, § 116, 118 Stat. 2809, 3346 (Dec. 8, 2004); Mt. Soledad Veterans Memorial Acquisition Act, Pub. L. No. 109-272, 120 Stat. 770 (Aug. 14, 2006) (hereinafter "the Act"). Immediately after the Act was signed into law, the Jewish War Veterans of the United States of America, Inc. ("JWV") filed suit in federal district court in California challenging under the Establishment Clause of the First Amendment both the Act and the display

1

of the cross by the Secretary of Defense ("the Secretary"), under whose control Congress placed the Memorial.  Pub. L. No. 109-272, § 2(c), 120 Stat. at 771.

As part of their discovery efforts in that challenge, JWV served subpoenas on the Office of General Counsel of the House of Representatives seeking nine categories of documents in the possession or control of United States Representatives Duncan Hunter, Brian Bilbray, and Darrell Issa, the three southern California Congressmen who had sponsored the Act.  All three Congressmen (collectively "the Members") lodged objections to the subpoenas, contending primarily that the documents requested were irrelevant to the JWV plaintiffs' Establishment Clause claims and that some of the production sought was barred by the Speech or Debate Clause of the Constitution, U.S. Const. art. I, § 6, cl. 1.  Following unsuccessful attempts to resolve the dispute, JWV filed in this court motions to compel each of the Members to produce the requested documents.  The Members, joined by the Secretary (who is the named defendant in the California litigation), oppose the motions, a hearing on which was held on July 31, 2007.  After careful consideration of the pre- and post-hearing filings, and for the reasons set forth below, the Court will grant in part and deny in part JWV's motions to compel.


**BACKGROUND**

**A.  History of the Mt. Soledad Litigation and Legislation**

The history of the Mt. Soledad cross dates to 1916 and has been recounted in the various judicial opinions resolving legal challenges to the cross.  See, e.g., Paulson v. City of San Diego, 294 F.3d 1124, 1125-27 (9th Cir. 2002) (en banc); Ellis v. City of La Mesa, 990 F.2d 1518, 1521-22 (9th Cir. 1993); Paulson v. Abdelnour, 51 Cal. Rptr. 3d 575, 580-85 (Cal. Ct. App.

2006). A truncated account of the relevant events since 1952, and particularly the events that have occurred during the course of the recent litigation, will suffice for present purposes. The current concrete cross was constructed by the Mt. Soledad Memorial Association ("MSMA") and was dedicated to the veterans of World Wars I and II and the Korean War on Easter Sunday in 1954. Since that time, the cross has been the setting for annual Easter Sunday services, as well as weddings and baptisms. At least one local map formerly referred to the location as the Mt. Soledad Easter Cross. JWV Mem. in Support of Mot. to Compel ("JWV Mem."), Exh. A (2006 Calif. Compl.) ¶¶ 17-19.

Things began to change in 1989 when a private citizen sued the City of San Diego in federal court, alleging that the cross's presence on city property violated the First Amendment to the U.S. Constitution and the "No Preference" Clause of the California Constitution. While the suit was pending, the MSMA installed a marker identifying the location as a veterans memorial, and later altered the existing structure by installing a large American flag, adding bollards that honor community and veterans groups, and erecting six concentric walls that hold approximately 1,800 plaques engraved with the names and photographs of individual veterans. JWV Mem. at 3; Id., Exh. A at ¶ 20. These changes did not, however, stave off adverse legal rulings. The district court in 1991 held that the display of the cross on public land violated the California Constitution and ordered the cross removed. Murphy v. Bilbray, 782 F. Supp. 1420, 1438 (S.D. Cal. 1991). On appeal, the Ninth Circuit affirmed, describing the cross as "[a] sectarian war memorial [that] carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." Ellis, 990 F.2d at 1518. The City responded by attempting to sell the land under the cross to the MSMA. This effort was the first of what turned

3

out to be multiple maneuvers designed to cure the constitutional infirmity while retaining the Mt.

Soledad cross. The effort failed, however, when the district court invalidated the sale as directed

at preserving a religious symbol and thus impermissibly showing a government preference for

religion. Murphy v. Bilbray, Civ. A. Nos. 90-134, 89-820, 1997 WL 754604, at *10 (S.D. Cal.

Sept. 18, 1997). A second attempt to sell the land to the MSMA was struck down by the

en banc Ninth Circuit on similar grounds in 2002. Paulson, 294 F.3d at 1132-33.

　　　　Following these legal setbacks, the City in late 2004 came close to entering into a

settlement agreement pursuant to which the cross would be moved to a nearby church and would

be replaced at the Mt. Soledad Veterans Memorial with a non-sectarian symbol. Veterans groups

and the MSMA supported the proposed settlement, and voters rejected a ballot initiative that

would have allowed the City once again to sell the land containing the cross to a private party.

Nevertheless, the City never officially entered into the agreement. JWV Mem., Exh. A ¶ 31.

During the same period, groups that supported the display of the cross on public land began to

seek federal intervention. The Thomas More Law Center ("TMLC") sent a letter to Congressman

Randy "Duke" Cunningham the week after the unsuccessful ballot initiative. In that letter, the

TMLC requested that Congressman Cunningham secure federal legislation declaring the Mt.

Soledad cross a national war memorial. Id. ¶ 35. Cunningham attempted to do so less than a

month later when he attached to an omnibus appropriations bill a rider that (1) designated the Mt.

Soledad Veterans Memorial as a national war memorial, (2) authorized the Department of

Interior to accept the Memorial as a donation from the City, and (3) directed the National Park

Service to enter into a memorandum of understanding with the MSMA for maintaining and

administering the Memorial. Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Div.

J., Title I, § 116, 118 Stat. 2809, 3346 (Dec. 8, 2004) (codified at 16 U.S.C. § 431 note).

The federal legislation placed the matter back in the hands of the City, which had to decide whether to donate the cross to the U.S. government. After initially voting against donation in March of 2005, the City Council decided to put the issue to a public referendum, known as "Proposition A." JWV Mem., Exh. A ¶¶ 40-44. Proposition A passed at a special election held in July of 2005. Id. ¶ 44. In October of that year, however, a California state court struck down the referendum as unconstitutional under the California Constitution. Id. ¶ 48.

While the expedited appeal of that ruling was pending, activity shifted once again to federal fora. The California district judge who had overseen the seventeen years of federal litigation entered an order in May of 2006 enforcing the original permanent injunction, such that the City had to remove the cross from public land within ninety days or face fines of $5,000 per day. Id. ¶ 50. After the Ninth Circuit denied a request for a stay, the City sought relief in the U.S. Supreme Court. Justice Kennedy, acting as Circuit Justice, granted the stay. San Diegans for the Mr. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. --, 126 S. Ct. 2856 (2006) (Kennedy, J., in chambers). He reasoned that "Congress' evident desire to preserve the memorial" (as expressed in the 2004 legislation), along with a pending state-court appeal that could validate the transfer outright or at least "provide important guidance regarding" issues of California law, tilted the balance toward maintaining the status quo. Id. at 2857-58. As it turns out, the California Court of Appeal in late 2006 reversed the trial court ruling that had invalidated the voter-approved transfer. Paulson v. Abdelnour, 51 Cal. Rptr. 575, 580 (Cal. Ct. App. 2006).

San Diego-area Congressmen did not, however, await the federal or state court decisions before taking action of their own. Within a week of the district court's order, Congressman

5

Duncan Hunter (Congressman Cunningham had resigned his seat by that time) asked President Bush to invoke the authority conferred by a federal statute, 40 U.S.C. § 3113, to take immediate possession of the Mt. Soledad Cross. JWV Mem., Exh. A ¶¶ 53. Then in late June of 2006, Hunter introduced H.R. 5683, a bill designed to transfer the Mt. Soledad Veterans Memorial to federal control effective immediately. Congressmen Darrell Issa and Brian Bilbray (who had taken Cunningham's seat) joined Hunter as co-sponsors of the bill, and all three made public statements on the subject during the summer of 2006. The bill passed both houses of Congress by early August of 2006, and the President signed it into law on August 14, 2006. Mt. Soledad Veterans Memorial Acquisition Act, Pub. L. No. 109-272, 120 Stat. 770 (hereinafter "the Act"). As enacted, the Act contains Congressional findings, announces its intent as "effectuat[ing] the purpose" of the 2004 legislation spearheaded by then-Representative Cunningham, and requires the Secretary of Defense to manage the property upon acquisition and to "enter into a memorandum of understanding with the [MSMA] for the continued maintenance of the [Memorial] by the [MSMA]." Id. §§ 1-2, 120 Stat. at 770-771.

**B.  Current Litigation**

The first legal challenge to the Act and the federal government's display of the cross was filed in the Southern District of California even before the President had signed the Act into law. Trunk v. City of San Diego, Civ. A. No. 06-1597, Dkt. #1 (S.D. Cal. Aug. 9, 2006). And before the ink from either the President's signature or the Trunk complaint had dried, JWV had filed its own Complaint challenging the Act and the presence of the cross on public land. JWV Mem., Exh. A. The two cases, which named as defendants, among others, the City, the United States, the Secretary of State, and the MSMA, were consolidated for pretrial purposes in an order dated

6

September 22, 2006.  Members' Opp'n to Mot. to Compel ("Members' Opp'n"), Exh. MC 1.

During the discovery period, the Trunk plaintiffs filed a motion to compel the depositions of San Diego Mayor Jerry Sanders and Congressman Hunter.  Members' Opp'n, Exh. 6.  Hunter's testimony was relevant, the plaintiffs argued, because it would "confirm that the purpose of the legislation he sponsored . . . was to preserve the presence of the Mt. Soledad Latin cross on public property."  Id. at 1-2.  Although the JWV plaintiffs did not formally join in the motion to compel, they sent the Magistrate Judge a letter after briefing was complete indicating their support for the Trunk plaintiffs' position.  The letter was necessary, JWV's counsel informed the Magistrate Judge, to respond to the City's briefing, "which falsely suggest[s] that JWV Plaintiffs' failure to join Trunk's motions is an indication that we believe Trunk's position to be without legal merit."  Fed. Def.'s Mem. in Opp'n to Mot. to Compel ("Fed. Opp'n"), Exh. E.  A week later, the Magistrate Judge denied the motion to compel in an eleven-page order, a footnote in which portrayed the JWV plaintiffs as having joined in the motion.  JWV Mem., Exh. E at 2 n.1.  The judge ruled as an initial matter that Congressman Hunter's deposition was barred by the Speech or Debate Clause; he also concluded that the anticipated testimony of Hunter and Sanders was irrelevant to the governing Establishment Clause inquiry, and that the motion would be denied as a matter of discretion in any event because the plaintiffs had access to alternative sources of information and the requested testimony would therefore be duplicative.  Id. at 6-11.

While the California litigation focused on the Trunk plaintiffs' discovery requests, the JWV plaintiffs served subpoenas on Congressmen Hunter, Bilbray, and Issa on March 21, 2007.  JWV Mem., Exh. B; Members' Opp'n, Exh. MC 8.  Each subpoena sought nine categories of documents within the Members' possession or control, and each was tailored, an introductory

letter stated, "as narrowly as possible, and expressly [was] not seeking documents protected from disclosure by the Speech and Debate Clause of the United States Constitution."   The nine specifications directed to the Members are as follows:

> 1.  All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

> 2.  All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

> 3.  All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

> 4.  All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

> 5.  All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

> 6.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the [sic] any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.

> 7.  All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

> 8.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding the

8

administration or implementation of H.R. 5683.

9. All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

On April 9, 2007, the Members objected to the subpoenas pursuant to Fed. R. Civ. P. 45(c)(2)(B). They contended (in pertinent part) that the documents sought were not relevant to JWV's California suit, that the information requested was available from more convenient sources, and that disclosure of some of the documents was barred by the Speech and Debate Clause. JWV Mem., Exh. C; Members' Opp'n, Exh. MC 9. The Members claim that the Speech or Debate Clause protects many but not all of the documents responsive to specifications 3, 5, 7 and 9. The parties worked to narrow their differences, but were unable to reach a resolution. JWV's motions to compel followed.

A hearing on the motions was held on July 31, 2007. At the hearing, counsel for the Members represented that the Members had at least some documents responsive to all nine of the specifications. Counsel also expressed a willingness to compile and file a list describing the documents responsive to specifications 1, 2, 4, 6 and 8. The Court entered a post-hearing order requiring counsel to do so, and also requiring the JWV plaintiffs both to confirm that they still sought the documents described and to explain how those documents were relevant. Dkt. #22 (Order of July 31, 2007). In their post-hearing filing, the Members listed dozens of responsive documents and also clarified that they do not, in fact, have any documents responsive to specification 8. JWV's response and the Members' reply have been received, and the three motions to compel are now ripe for resolution.

## DISCUSSION

The pending motions to compel present the superficially simple question of whether the JWV plaintiffs are entitled to any or all of the documentary discovery they seek from the Members.  Likewise, the objections interposed by the Members and the Secretary of Defense appear on the surface to be nothing more than variants of objections that arise with some frequency in subpoena-related litigation: relevance and privilege.  The relevance and privilege objections in this case, however, are neither superficial nor simple.  They instead raise complex questions of constitutional significance, implicating on the one hand the important rights safeguarded by the Establishment Clause of the First Amendment, and on the other the principles of legislative independence and the separation of powers enshrined in the Speech or Debate Clause of the Constitution, U.S. Const. art. I, § 6, cl. 1.  Cognizant of these sensitive constitutional issues, the Court will proceed cautiously in its analysis, taking care to decide only those questions directly raised in this subpoena dispute and to avoid passing on the weighty issues presented in the underlying litigation.  As an initial matter, however, the Court must decide whether it need even reach these sensitive constitutional issues or whether, as the Members and the Secretary contend, two related doctrines require deference to the recent discovery ruling by the Magistrate Judge in California.

## A.  Law of the Case/Issue Preclusion

The Members' opening salvo is that the April 2, 2007 order by the Magistrate Judge constitutes the "law of the case" and bars the JWV plaintiffs from relitigating the relevance of the individual Congressmen's motives.  Members' Opp'n at 8-9.  In that order, it will be recalled, the Magistrate Judge concluded that the deposition testimony of Congressman Hunter sought by the

<u>Trunk</u> plaintiffs was "not relevant to the inquiry under the Establishment Clause."  JWV Mem.,

Exh. E at 7.  "The law-of-the-case doctrine rests on a simple premise: 'the <u>same</u> issue presented a

second time in the <u>same case</u> in the <u>same court</u> should lead to the <u>same result</u>.'"  <u>Kimberlin v.

Quinlan</u>, 199 F.3d 496, 500 (D.C. Cir. 1999) (quoting <u>LaShawn A. v. Barry</u>, 87 F.3d 1389, 1393

(D.C. Cir. 1996) (en banc)).  But the doctrine applies, the D.C. Circuit has emphasized, only

"within the same case, proceeding, or action."  <u>In re Subpoena Duces Tecum Issued to

Commodity Futures Trading Comm'n</u>, 439 F.3d 740, 749 (D.C. Cir. 2006).  And because "'a

subpoena enforcement action is technically a different case,'" the law-of-the-case doctrine does

not apply in that setting, which amounts to "a new, albeit ancillary, proceeding in a different

court."  <u>Id.</u> (citation and alteration omitted).  The law-of-the-case doctrine thus does not apply to

this "subpoena enforcement action" that is "ancillary" to the California litigation.  <u>Id.</u>

      In a similar vein, the Secretary invokes the concept of issue preclusion (also called

collateral estoppel), arguing that the JWV plaintiffs had a full opportunity to litigate the

relevance issue in the California proceeding and should be bound by the determination made

there.  Fed. Opp'n at 14-16.  The D.C. Circuit has articulated a three-step test to decide whether

collateral estoppel bars further litigation of an issue: 1) the same issue now being raised must

have been contested by the parties and submitted for judicial determination in the prior case; 2)

the issue must have been actually and necessarily determined by a court of competent jurisdiction

in that prior case; and 3) preclusion in the second case must not work a basic unfairness to the

party bound by the first determination.  <u>See</u> <u>Martin v. Dep't of Justice</u>, 488 F.3d 446, 454 (D.C.

Cir. 2007); <u>Yamaha Corp. of Am. v. United States</u>, 961 F.2d 245, 254 (D.C. Cir. 1992).

According to the Secretary, the relevance objection raised by the Members presents the same

issue "actually" and fully resolved by the Magistrate Judge in California. Furthermore, because the JWV plaintiffs had a full opportunity to litigate the issue and later declined to challenge the adverse ruling, denying them a second bite at the apple would be in no sense "unfair."

Resolution of the first two steps of the inquiry is not as straightforward as the Secretary portrays it. For one thing, there is substantial confusion in the record over whether the JWV plaintiffs actually joined in the motion to compel eventually denied by the Magistrate Judge. Although the judge quite clearly believed that they had joined, see JWV Mem., Exh. E at 2 n.1, a letter from JWV's counsel sent one week before the ruling confirms that the JWV plaintiffs did not join the motion and felt obliged to state their position only because the City defendants were trying to use JWV's supposed failure to join to the City's advantage. Fed. Def.'s Mem., Exh. E. The extent of JWV's participation in the motions practice may seem a small point, but it acquires significance when measured against the D.C. Circuit's statement that issue preclusion "bars relitigation only by those parties who actually litigated the issue in the prior proceeding." Alabama Rivers Alliance v. FERC, 325 F.3d 290, 295 n.7 (D.C. Cir. 2003) (citing Baker v. Gen. Motors Corp., 522 U.S. 222, 237 n.11 (1998)). JWV's status as a party that "actually litigated" the relevance question, in other words, cannot be ignored in deciding whether to preclude further litigation over that question.

But even assuming that the JWV plaintiffs did formally join the motion, it is not at all clear that the specific relevance issues raised by JWV's three subpoenas were "actually and necessarily determined by" the Magistrate Judge in his April 2, 2007 ruling. The Secretary casts the "issue" at a high level of generality -- whether an individual legislator's "motives" in sponsoring legislation are relevant to the Establishment Clause inquiry. Fed. Opp'n at 15. Some

passages in the April 2 order indeed suggest that the Magistrate Judge believed that "legislative motives" will never be relevant in determining the constitutionality of government action under either the Establishment Clause specifically or the First Amendment more generally.  But the Secretary overlooks what the Magistrate Judge himself identified as "the specific issue" before him: "whether a party is entitled to, or needs, to depose the sponsors of the . . . statute being challenged as violative of the Establishment Clause."  JWV Mem., Exh. E at 7.  That is not, of course, the "specific issue" raised by JWV's subpoenas and the current motion to compel, which together seek nine specific categories of <u>documents</u> (not deposition testimony) that are ostensibly in the possession or control of the Members.  The question here, therefore, is whether the documents requested are relevant to the underlying constitutional claims -- that is, whether those documents provide information that, although possibly inadmissible at later stages of litigation, "appears reasonably calculated to lead to the discovery of admissible evidence."  <u>See</u> Fed. R. Civ. P. 26(b)(1) (defining relevance).  In short, the differences between the "specific issue" resolved by the Magistrate Judge and the issues presented in this suit weigh heavily against applying collateral estoppel here.  <u>Cf.</u> <u>Comm'r of Internal Revenue v. Sunnen</u>, 333 U.S. 591, 599-600 (1948) (observing in an income-tax case that collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged").

There are at least two other problems with according preclusive effect to the Magistrate Judge's ruling.  The first -- the fact that the relevance determination was one of three alternative grounds for denying the requested discovery -- speaks directly to what was "necessarily" decided in the April 2 order.  This is important because collateral estoppel applies "only to issues whose

resolution was necessary to the judgment," <u>Norfolk & Western Ry. Co. v. United States</u>, 768 F.2d 373, 379 (D.C. Cir. 1985) (citing Restatement (Second) of Judgments § 27 comment h (1982)), and courts and commentators have divided as to the wisdom of deeming alternative holdings "necessary to the judgment" and hence eligible for preclusive effect. <u>See</u> <u>Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.</u>, 458 F.3d 244, 251-52 (3d Cir. 2006) (chronicling the circuit split and the change in position from the first to the second Restatement of Judgments); <u>cf.</u> <u>Dozier v. Ford Motor Co.</u>, 702 F.2d 1189, 1194 & nn.9-10 (D.C. Cir. 1984) (raising but not definitively resolving the issue) (Scalia, J.). The Magistrate Judge quite clearly concluded that Congressman Hunter's deposition testimony as to his motives for introducing the legislation would be irrelevant, but reached this issue only after deciding that such testimony would have been barred in any event by the Speech or Debate Clause. JWV Mem., Exh. E at 6. Once the judge had reached this latter conclusion, the motion to compel had to be denied with respect to Congressman Hunter, and the judge had no reason to make a relevance ruling that amounted to <u>dictum</u>. <u>Cf.</u> Restatement (Second) of Judgments § 27 comment h ("Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made."). But the judge did just that, further stating that he would have denied the <u>Trunk</u> plaintiffs' motion to compel on the additional ground that the plaintiffs already had access to "a significant amount of source material . . . on the issue of legislative purpose" and that the information sought would therefore "be unnecessarily duplicative." <u>Id.</u> at 10. Far from being a conclusive and necessary adjudication, then, the Magistrate Judge's relevance ruling was simply one of three alternate and independent grounds on which the <u>Trunk</u> plaintiffs' motion to compel could have been, and would have been, denied.

The second source of unease is one on which this Court has previously focused -- namely, doubts as to whether a discovery order of a Magistrate Judge, even one unchallenged by the affected parties, constitutes a "final judgment" for purposes of issue preclusion. See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n, 370 F. Supp. 2d 201, 205 (D.D.C. 2005), aff'd, 439 F.3d 740 (D.C. Cir. 2006). This Court cited to a line of persuasive authority, including case law from the Fifth Circuit, that has declined to treat a Magistrate Judge's order as final until "the district court makes it final." J.R. Stripling v. Jordan Prod. Co., 234 F.3d 863, 868 (5th Cir. 2000). In affirming this Court's decision, the D.C. Circuit noted the same issue but, as this Court had done, declined to rest its ruling on that ground. Nevertheless, this Court's concerns apply with equal force to this setting, and nothing in the two footnotes that the Members and the Secretary collectively dedicate to this point serves to alleviate those concerns. See Fed. Opp'n at 15 n.5; Members' Opp'n at 4 n.2.

All of this uncertainty at the first two steps of the issue-preclusion inquiry -- whether the parties are actually the same, the specific issues are truly identical, the determination made was necessary to the judgment, and the previous ruling in question is sufficiently final -- leads to the conclusion at the third step that giving preclusive effect to the Magistrate Judge's decision would work a "basic unfairness" to JWV. See Yamaha Corp., 961 F.2d at 254. This conclusion is informed by the D.C. Circuit's observation that the third element in the preclusion analysis "is not likely to be present where the first or second element is unclear." Milton S. Kronheim & Co. v. District of Columbia, 91 F.3d 193, 197 (D.C. Cir. 1996). "[L]ogically," the court explained, "there is a fair probability of unfairness in estopping the relitigation of an issue where the fullness of its first litigation is uncertain." Id. That is precisely the scenario here, where substantial doubt

15

exists as to whether the basic prerequisites for invoking issue preclusion have been satisfied.

Heeding the court of appeals' observation in Kronheim & Co., and keeping in mind that issue

preclusion is at bottom an equitable doctrine, see Jack Faucett Assocs., Inc. v. AT & T, 744 F.2d

118, 125 (D.C. Cir. 1984), the Court declines to accord preclusive effect to the Magistrate

Judge's relevance ruling in the California litigation.

## B.  Relevance

The Federal Rules of Civil Procedure permit broad access to relevant information at the

discovery stage.  Litigants "may obtain discovery regarding any matter, not privileged, that is

relevant to the claim or defense of any party . . . ."  Fed. R. Civ. P. 26(b)(1).[1]  "Generally

speaking, 'relevance' for discovery purposes is broadly construed."  Food Lion v. United Food &

Commer. Workers Int'l Union, 103 F.3d 1007, 1012 (D.C. Cir. 1997); see also Oppenheimer

Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (observing that the term relevance "has been

construed broadly to encompass any matter that bears on, or that reasonably could lead to other

matter that could bear on, any issue that is or may be in the case").  Information sought may be

"relevant" even if it is not admissible at the merits stage, so long as "the discovery appears

reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).

Put differently, "a party may discover information which is not admissible at trial if such

information will have some probable effect on the organization and presentation of the moving

---

[1] The Members point out that their ability to comply with a subpoena is limited by Rule VIII of the House of Representatives, which allows a Congressman to honor a subpoena that is "a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House."  Member's Opp'n at 5.  There is no suggestion, however, that the term "relevant" in Rule VIII differs substantively from its counterpart in Fed. R. Civ. P. 26(b).  The Court will therefore treat the two rules as imposing the same standard.

party's case."  Smith v. Schlesinger, 513 F.2d 462, 473 (D.C. Cir. 1975) (citations omitted).[2]  The

term "relevant" thus has a different meaning -- and a broader scope -- under Fed. R. Civ. P. 26(b)

than it does under Rule 401 of the Federal Rules of Evidence.  See, e.g., Hodgdon v.

Northwestern Univ., -- F. Supp. 2d --, 2007 WL 1576486, at *3 (N.D. Ill. May 29, 2007); Lineen

v. Metcalf & Eddy, Inc., No. 96-2718, 1997 WL 73763, at *1 (S.D.N.Y. Feb. 21, 1997); 8

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure

§ 2008, at 110-114 (2d ed. 1994).

When a request for discovery is propounded, the party opposing the request should lodge

an objection pursuant to Fed. R. Civ. P. 45(c)(2)(B).  The party moving to compel production of

documents bears the initial burden of explaining how the requested information is relevant.  See

Bethea v. Comcast, 218 F.R.D. 328, 329 (D.D.C. 2003).  Once that showing is made, however,

the burden shifts to the objecting party to explain why discovery should not be permitted.  See

Doe v. District of Columbia, 231 F.R.D. 27, 30 (D.D.C. 2005); Anderson v. FBI, 192 F.R.D. 50,

53 (D.D.C. 2000).[3]  Moreover, the general policy favoring broad discovery is particularly

applicable where, as here, the court making the relevance determination has jurisdiction only

---

[2] Smith and Oppenheimer, as well as some of the other cases cited above, were decided before the 2000 amendments to Rule 26(b).  Those amendments, however, did "not effect a dramatic change in the scope of discovery."  8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2008, at 35 (2d ed. Supp. 2007).  The standards announced in the earlier cases therefore remain instructive, and those cases continue to be cited frequently.  See, e.g., Moore v. Hartman, 241 F.R.D. 59, 62 (D.D.C. 2007) (citing Smith).

[3] Earlier cases in this district appear to place the initial burden of showing that the requested production is irrelevant on the party resisting discovery.  See, e.g., Chubb Integrated Sys. Ltd. v. Nat'l Bank of Washington, 103 F.R.D. 52, 58 n.3 (D.D.C. 1984).  Some courts still follow that practice, but have acknowledged the division of authority.  See Merrill v. Waffle House, Inc., 227 F.R.D. 475, 477 (N.D. Tex. 2005).  The burden-shifting approach represents the majority view and, although not outcome determinative, will be followed here.

over the discovery dispute, and hence has less familiarity with the intricacies of the governing substantive law than does the court overseeing the underlying litigation. See Flanagan v. Wyndham Int'l, Inc., 231 F.R.D. 98, 103 (D.D.C. 2005); accord Truswal Sys. Corp. v. Hydro-Air Engineering, Inc., 813 F.2d 1207, 1211-12 (Fed. Cir. 1987); Horizons Titanium Corp. v. Norton Co., 290 F.2d 421, 425 (1st Cir. 1961); Gonzales v. Google, Inc., 234 F.R.D. 674, 680-81 (N.D. Cal. 2006). In such situations, doubts regarding the relevance of requested information should be resolved in favor "of permissive discovery." Flanagan, 231 F.R.D. at 103.

It is against the backdrop of these settled discovery standards that the Court approaches the parties' far-reaching arguments parsing the Supreme Court's complex and shifting Establishment Clause jurisprudence. This Court's task is not to weigh the strength of JWV's case or to assess the relative probative value of each piece of documentary evidence that might be responsive to the subpoenas served on the Members.[4] Nor need the Court resolve, as the Members ask it to do, the controversy over whether JWV's challenge to the presence of the Mt. Soledad cross on federal property should be analyzed under the test applied by the plurality in Van Orden v. Perry, 545 U.S. 677 (2005), or the one applied by a majority of the Supreme Court on the same day in McCreary County v. ACLU, 545 U.S. 844 (2005). That is a task assigned to the district court in California. This Court's task, in contrast, is the limited one of determining

---

[4] Although the relative strength or weakness of JWV's claims does not affect the relevance determination, the fact that JWV's Establishment Clause challenge finds support in Ninth Circuit case law independent of any further discovery does serve to dispel any notion that the discovery requests at issue are frivolous or part of a fishing expedition. It is worth noting in this regard that the Ninth Circuit has held that the display on government property of Latin crosses both larger and smaller than the Mt. Soledad cross violates the Establishment Clause. See Buono v. Norton, 371 F.3d 543 (9th Cir. 2004); Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617 (9th Cir.1996) (per curiam).

relevance as that term is construed at the discovery stage.  In carrying out that responsibility, the Court will assume that the JWV plaintiffs have sufficiently pled challenges to both the Act and the display of the cross on federal property, and will evaluate relevance under the broadest Establishment Clause test that is consistent with Supreme Court and Ninth Circuit precedent: the three-part inquiry articulated in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971).  <u>See</u> <u>Acceses Fund v. U.S. Dep't of Agriculture</u>, -- F.3d --, 2007 WL 2410135, at *5 (9th Cir. Aug. 27, 2007) ("The <u>Lemon</u> test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause."); <u>accord</u> <u>Inouye v. Kemna</u>, -- F.3d --, 2007 WL 2556277, at *3 n.7 (9th Cir. Sept. 7, 2007); <u>Vasquez v. Los Angeles County</u>, 487 F.3d 1246, 1254 (9th Cir. 2007).

### 1. Establishment Clause Framework

The Supreme Court in <u>Lemon</u> set forth an often criticized (but frequently applied) three-part test for determining whether government action is consistent with the Establishment Clause. <u>See</u> <u>Newdow v. Bush</u>, 355 F. Supp. 2d 265, 283 (D.D.C. 2005) ("Although often criticized, and even occasionally ignored, the <u>Lemon</u> test remains viable law, and therefore serves to this day as the governing standard for assessing the constitutionality of most state-sponsored religious activities under the Establishment Clause.").  Under that test, the government action, first, "must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [action] must not foster an excessive government entanglement with religion." <u>Lemon</u>, 403 U.S. at 612-13 (citations and quotation marks omitted).  In subsequent cases, the Court has refined -- and in some instances altered -- the contours of the three prongs.  The first step, for example, has more recently focused on whether "the government acts with the ostensible and predominant purpose of advancing religion."

McCreary County, 545 U.S. at 864.

Much of controversy in this case centers on the sources from which governmental "purpose" can be gleaned. Not only do the Supreme Court's recent decisions, "Januslike, point in [different] directions in applying the Establishment Clause," Van Orden, 545 U.S. at 683 (plurality opinion), but even adjacent passages in the most recent majority opinion send mixed signals. On the one hand, the Court reaffirmed that it is useful in the Establishment Clause context to gain "an understanding of official objective [that] emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." McCreary County, 545 U.S. at 862. A court "determining the legislative purpose of a statute" may consider "the historical context of the statute, and the specific sequence of events leading to passage of the statute." Edwards v. Aguillard, 482 U.S. 578, 595 (1987); accord McCreary County, 545 U.S. at 862. "The eyes that look to purpose," the Court elaborated, "belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." Id. (citations omitted). No definition of what constitutes a "comparable official act" was given, but McCreary County itself likely provides an example: a dedication ceremony for the religious display at which a public official appeared with his pastor. Id. at 869. The Court also reaffirmed the vitality of previous cases that had examined changes in the wording of a statute from one version to the next, the public comments of a statute's sponsor, and the history and context in which a challenged policy arose -- in short, "openly available data" that, in those instances, "supported a commonsense conclusion that a religious objective permeated the government's action." Id. at 862-63 (citing Edwards, 482 U.S. at 586-88; Wallace v. Jaffree, 472 U.S. 38, 58-60 (1985)); see

20

also Santa Fe Independent Sch. Dist. v. Doe, 530 U.S. 290, 314-15 (2000).  This focus on

"openly available data" and not on "the veiled psyche of government officers" might allow

"savvy officials [to disguise] their religious intent so cleverly that the objective observer just

misse[s] it."  McCreary County, 545 U.S. at 863.  "But that is no reason for great constitutional

concern," the Court explained, because the objective observer would not view the official action

as "taking religious sides," and hidden purpose might well manifest itself as an impermissible

"effect" at the next step of the Lemon analysis.  Id.

      At the same time, however, the McCreary County Court appeared to put more bite into

the purpose inquiry.  Citing with approval language in Edwards, the Court reaffirmed that history

and context matter, and that the relevant context includes "the specific sequence of events

leading to" the challenged governmental action.[5]  545 U.S. at 862 (quoting Edwards, 482 U.S. at

595).  The Court went on to clarify that the "objective observer" is "one presumed to be familiar

with the history of the government's actions and competent to learn what history has to show,"

not the "absentminded objective observer" that the county officials there had envisioned.  545

U.S. at 866.  Moreover, it rejected the notion that any secular purpose will suffice, no matter how

minor or implausible.  The secular purpose "has to be genuine, not a sham, and not merely

secondary to a religious objective."  Id. at 864.  And, while deference is generally owed to "a

---

     [5] Edwards took the phrase "specific sequence of events" from Village of Arlington
Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 267 (1977).  In the quoted
portion of Arlington Heights, the Supreme Court explained what evidentiary sources litigants can
use to show that a legislative or administrative body acted with an "invidious discriminatory
purpose" in violation of the Equal Protection Clause.  Id. at 265-68.  The Court approved
reference to "[t]he historical background" of the challenged decision, procedural or substantive
departures from normal practice, legislative or administrative history, and even, "[i]n some
extraordinary instances," calling the legislators or administrators "to the stand at trial to testify
concerning the purpose of the official action."  Id. at 267-68.

legislature's stated reasons," id., "no adequate secular object" will be found where the proffered purpose is "an apparent sham." Id. at 865. This guidance from McCreary County, then, with its varying points of emphasis, represents the Supreme Court's most recent word on the nature of the purpose inquiry.

Lemon's second step has also undergone revision. Adopting the "endorsement" test first advocated by Justice O'Connor, the Court now examines not just whether the challenged governmental action's "principal or primary effect . . . advances religion," 403 U.S. at 612, but also whether that action "is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as disapproval, of their individual religious choices." County of Allegheny v. ACLU, 492 U.S. 573, 597 (1989) (plurality opinion of Blackmun, J.) (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390 (1985)). This test, as was the case in County of Allegheny, has been applied to challenges to displays of religious symbols on public property. The effect of the display "depends upon the message that the government's practice communicates," an inquiry that, "by necessity, turns upon the context in which the contested object appears." Id. at 595. What counts is the display's effect on a "reasonable observer," who resembles "the 'reasonable person' in tort law." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 779 (1995) (O'Connor, J., joined by Souter and Breyer, JJ., concurring in part and concurring in the judgment). This "reasonable observer" is "more informed than the casual passerby," id., and is "deemed aware of the history and context of the community and forum in which the religious display appears." Id. at 780; see also Kreisner v. City of San Diego, 1 F.3d 775, 784 (9th Cir. 1993) ("This hypothetical observer is informed as well as reasonable; we assume that he or she is familiar with the history of the

22

government practice at issue . . . .").

The third <u>Lemon</u> factor addresses whether the challenged action "foster[s] an excessive government entanglement with religion," 403 U.S. at 613.  This inquiry "requires examination of 'the character and purposes of the institutions that are benefitted, the nature of the aid that the [government] provides, and the resulting relationship between the government and the religious authority.'"  <u>Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.</u>, 493 U.S. 378, 393 (1990) (quoting <u>Lemon</u>, 403 U.S. at 615).  These factors, the Court has observed, "are similar to the factors [used] to examine 'effect.'"  <u>Agostini v. Felton</u>, 521 U.S. 203, 232 (1997).  Although most often discussed in the context of governmental assistance programs or tax credits, <u>see, e.g.</u>, <u>id.</u> at 232-34; <u>Bowen v. Kendrick</u>, 487 U.S. 589, 615-17 (1988) ("Most of the cases in which the Court has divided over the 'entanglement' part of the <u>Lemon</u> test have involved aid to parochial schools."), the entanglement inquiry also applies in evaluating the constitutionality of religious displays, <u>see</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 683-84 (1984) (finding no Establishment Clause violation in part because of "absence of administrative entanglement between religion and state resulting from the City's ownership and use of the crèche").

*2.  Relevance Determination*

The threshold question is whether JWV has met its initial burden of explaining how the requested documents are relevant to its Establishment Clause challenge.  <u>See</u> <u>Bethea</u>, 218 F.R.D. at 329.  JWV argues, and the Court agrees, that each category of documents requested has the potential to shed light on at least one of the three <u>Lemon</u> prongs.  Foremost among these is legislative purpose.  JWV points out that the Supreme Court recently reaffirmed that an improper legislative purpose can alone be sufficient to prove a violation of the Establishment Clause.

See McCreary County, 545 U.S. at 850.  In that vein, JWV envisions a searching inquiry into

purpose, one consistent with both McCreary County and earlier cases that interpret Lemon as

requiring examination of "all sources illuminative of [legislative] purpose," JWV Reply at 6

(quoting United Christian Scientists v. Christian Science Bd. of Directors, 829 F.2d 1152, 1164

n.50 (D.C. Cir. 1987)), including the statements of "parties who participated in the enactment or

implementation of the challenged law."  See Bonham v. District of Columbia Library Admin.,

989 F.2d 1242, 1245 (D.C. Cir. 1993).  Acknowledging that the Members' individual motives

cannot be equated with legislative purpose, JWV asserts that the requested documents are

relevant because they show "the historical context" and "specific sequence of events" leading to

both the Act's passage and the subsequent presence of the cross on federal government property.

JWV Reply at 10 (citing McCreary County, 545 U.S at 862; Edwards, 482 U.S. at 594-95).  The

"broad-ranging" inquiry that JWV envisions would also focus on information tending to prove

that the secular purpose proffered by the governmental defendants is a "sham," and to that end

would seek "to probe the press releases and public events to determine to what extent (if any) the

Members may have sought to conceal or display the religious intent of their actions."  JWV

Mem. at 15.  JWV would not, however, focus exclusively on these behind-the-scenes actions and

communications.  The requested discovery instead seeks "[c]ommunications with the press,

constituents, activist organizations, and other governmental entities[, which] are by definition

'unveiled' because they were made to others."  JWV Reply at 5-6.

      JWV likewise maintains that these communications, and in particular those made to

constituents and through the press, contribute to the "effect" that the Act and the display of the

cross will have on the reasonable observer.  Concretely, the views of this hypothetical person,

who is "deemed aware of the history and context of the community and forum in which the religious display appears," Pinette, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment), would be shaped by a legislator's public statements, letters to constituents, and involvement with religious groups, the content and background of which JWV's discovery requests seek to explore.  In arguing to the contrary, JWV contends, the Members and the Secretary are pushing the Court toward a ruling, "at the discovery stage, . . . that it is conceptually impossible for the primary sponsors of legislation to influence its real-world effect," JWV Reply at 12, and that the only sources possibly illustrative of "real-world effect" are publicly available ones.  Finally, the JWV plaintiffs assert that at least some of the responsive documents are likely to assist them in organizing their administrative-entanglement argument. See Lynch, 465 U.S. at 683-84.  This is so, they say, because the documents may capture the role of the Members, Executive Branch officials, and outside groups in crafting the statutorily required "memorandum of understanding" between the U.S. government and the Mt. Soledad Memorial Association.  JWV Reply at 14.

The Members and the Secretary take a diametrically opposed position, insisting that none of the requested documents are relevant to any of the inquiries required by Lemon.  Their argument proceeds along two principal tracks.  First, with respect to the purpose prong, they contend that the requested discovery is directed at the motives of individual legislators, rather than overall legislative purpose.  The Members and the Secretary concede the centrality of the latter concept in the Establishment Clause analysis, but maintain that an individual legislator's particular reasons for acting are both irrelevant and unascertainable.  They rely on the Ninth Circuit case cited by the Magistrate Judge, City of Las Vegas v. Foley, 747 F.2d 1294, 1297-98

(9th Cir. 1984) (barring depositions that sought to explore motives of city officials for enacting a zoning ordinance restricting the location of sexually oriented businesses), as well as the Supreme Court's decision in Bd of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226 (1990). A plurality of the Supreme Court in Mergens refused to invalidate a federal statute on the basis of a few individual legislators' possibly impermissible motives. 496 U.S. at 248-49. "[W]hat is relevant," the plurality explained in addressing that Establishment Clause challenge, "is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law." Id. at 249. The Secretary also presses the related notion that unofficial (or "extra-legislative") statements by individual legislators as to their motives for acting are not probative of legislative purpose, Fed. Opp'n at 8, while the Members highlight the difficulty of even determining an individual legislator's motives. Members' Opp'n at 12-13 ("[S]hort of putting the three members on a couch or in a deposition room . . . individual legislators' motivations for particular legislative actions remain unknowable and undiscoverable."). These overlapping arguments underscore the basic contention that JWV's discovery requests miss the mark insofar as they seek to uncover the hidden (or at least non-public) thoughts and acts of the Members, given that such thoughts and acts have no bearing on the reasonable observer's perception of a statute or a religious display.

The latter point forms the basis for the second and related proposition urged by the Members and the Secretary: that the evidence "relevant" to Lemon's purpose and effect prongs consists exclusively of public documents and communications, or what the McCreary County Court labeled "openly available data." 545 U.S. at 863. Both McCreary County and earlier cases provide some support for this position. The Court in McCreary County examined the content of

26

county resolutions and statements of purpose prepared during litigation, as well as changes in the display itself over the course of the litigation.  Id. at 868-73.  In Wallace, the Court focused on changes in the wording of a statute, in addition to "unrebutted evidence of legislative intent contained in the legislative record and in the testimony of the [statute's] sponsor," who had actually testified in the district court.  472 U.S. at 58.  The text of the statute was once again front and center in Edwards, where the comments of the bill's sponsor found in the legislative history likewise revealed the unlawful legislative purpose of advancing religion.  482 U.S. at 587, 591.  Finally, in Santa Fe Indep. Sch. Dist., the Court used the text of the challenged policy as the starting point for its analysis, at the same time "refus[ing] to turn a blind eye to the context in which th[e] policy arose."  530 U.S. at 314-15.  That context demonstrated that the policy was simply a continuation of the school district's history of sanctioning student-led prayers.  Id. at 315.

The Supreme Court did not suggest in any of these cases that the inquiry into whether a proffered secular purpose is genuine (or instead a sham) could be resolved using anything other than the sources it would otherwise use to determine purpose.  There is no indication, in other words, that a government official who proffers a secular purpose for a challenged action opens the door to an unlimited inquiry into his or her actual motives for taking the challenged action.  This focus on "openly available data" also has common-sense appeal.  After all, purpose and effect are judged from the point of view of a reasonable (or objective) observer, and this observer cannot be influenced by words or deeds of which he is not aware.  See Members' Opp'n at 14; Fed. Opp'n at 11.  The Members and the Secretary thus argue that, because the requested discovery neither consists of public documents nor is likely to lead to information available to the

public (and hence to the "reasonable observer"), any responsive documents would be irrelevant.

This argument regarding the type of information that the court resolving the merits of an Establishment Clause claim can consider has some force and may ultimately be the best reading of the murky case law.  That is to say, it may be that only "openly available data" is <u>admissible</u> to show legislative purpose and the effect of a challenged action.  On the other hand, the JWV plaintiffs have painted a rather grim picture of what litigating these cases would be like if that argument carries the day, with judges and litigants alike being forced to turn a blind eye to all but the information that government officials seeking to obscure their sectarian goals have "cherry picked" and placed in the public domain.  JWV Reply at 11.

But this Court need not choose between the two sides' starkly contrasting readings of <u>McCreary County</u> and the precedents on which it was based.  That is because the Members and the Secretary confuse the standard for relevance at the discovery stage with the standard for relevance at subsequent stages of litigation.  <u>See</u> 6 James Wm. Moore et al., Moore's Federal Practice § 37.22[2][a] (3d ed.) ("[T]he standard for determining whether information is relevant for purposes of pretrial discovery is substantially broader than the standard for relevance during trial.").  Now, the JWV plaintiffs need to show only that documents responsive to the eight specifications "will have some probable effect on the organization and presentation of" their case in the California district court.  <u>See</u> <u>Smith v. Schlesinger</u>, 513 F.2d 462, 473 (D.C. Cir. 1975); <u>see also</u> <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978) (construing the term relevance as "encompass[ing] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").  Moreover, given the uncertainty in the case law and the fact that this Court has jurisdiction only over the discovery

dispute, any doubts as to what will later be deemed admissible should be, and will be, resolved in favor of permissive discovery.  See Flanagan v. Wyndham Int'l, Inc., 231 F.R.D. 98, 103 (D.D.C. 2005) (collecting cases).  This presumption in favor of broad discovery, along with the fact that the Members and the Secretary bear the burden of rebutting JWV's initial proffer of relevance, see Anderson v. FBI, 192 F.R.D. 50, 53 (D.D.C. 2000), ultimately persuades the Court that the requested documents are "relevant" for purposes of Fed. R. Civ. P. 26(b) and House Rule VIII.

A few examples, drawn primarily from the Notice listing documents responsive to specifications 1, 2, 4, and 6 that the Members filed following the motions hearing, reveal how the requested documents may fill in the blanks of, or otherwise shape, the JWV plaintiffs' case.[6] Some of the documents responsive to specification 4 appear especially likely either to be admissible themselves or to lead to admissible evidence.  Both Congressman Hunter and Congressman Bilbray have form letters on the Mt. Soledad issue, one version of which was apparently sent to supporters of the proposed legislation and another version of which was sent to those not supporting it.  See Members' Post-Hearing Notice at 3-5 (#13-28), 9 (#8-9).  These letters may well constitute "openly available data" (assuming for the moment that this is the governing standard for admissibility) insofar as they were sent out by the Members, and thus could influence the effect on a reasonable observer of the Act or the display of the cross.  But even if the letters do not fit within the public-information limit urged by the Members and the Secretary, a comparison of the language in the different versions might well impact how JWV

---

[6] The documents included here are meant to be illustrative rather than exhaustive.  Many of the examples listed in JWV's post-hearing response, and others that the Court could articulate on the basis of the Members' Notice, would make the same point: that responsive documents are likely themselves either to constitute relevant evidence, to lead to relevant evidence, or at the very least to contribute to JWV's ability to present its claims in the underlying litigation.

presents its argument regarding the effect, and possibly the purpose, prong of the Lemon test. That these documents "could be relevant to the presentation of [JWV's] case" suffices at the pre-trial discovery stage under Rule 26(b).  See Smith, 513 F.2d at 473.

Among the documents responsive to specification 6 are also some likely to affect the JWV plaintiffs' attempt to demonstrate administrative entanglement of the kind described in Lynch, 465 U.S. at 683-84.  For example, Congressmen Hunter and Bilbray have e-mails that chronicle the Members' efforts to schedule meetings with Executive Branch officials after the passage of the Act.  Members' Post-Hearing Notice at 5-6, 10.  The Members admit that the e-mails, although focused on scheduling, nonetheless address "substantive matters" such as the Department of Defense's "interest in transferring the property to the Navy and its need to develop" the memorandum of understanding with the MSMA.  Members' Post-Hearing Reply at 6.  One of the e-mails from a Hunter staffer to the MSMA postdates an October 2, 2006 meeting with the Department of Defense attended by staffers for Hunter and Bilbray.  Members' Post-Heairing Notice at 6 (D-8), 10 (D-2).  To the extent that these e-mails reveal who was present at the meetings, what was discussed, and hence shed light on how much and what type of involvement the federal government will have with the administration of the Mt. Soledad cross, the documents are relevant for purposes of Rule 26(b).

Whether the documents responsive to specifications 3, 5, 7 and 9 are relevant under the discovery standard presents a more difficult question, in no small part because the Members' claim of privilege under the Speech or Debate Clause has prevented them from describing the

basic nature of the documents at issue.[7]  The Court is nevertheless convinced that responsive

documents will illuminate two principal areas of interest to the JWV plaintiffs: the details of

Members' efforts to secure Executive Branch intervention, and the role of religious organizations

in those efforts.  Specifications 5 and 7 target precisely these topics, seeking documents that

reflect the Members' own meetings and discussions with the Executive Branch, as well as any

attempts by the Members to arrange meetings between Executive Branch officials and others.

See JWV Mem., Exh. B at 5.  Such contacts are likely to tell part of the tale of how efforts to

secure action by the Executive Branch under existing laws culminated instead in a new federal

statute; as such, the contacts constitute part of the "specific sequence of events" leading to the

Act's passage no matter how narrowly that phrase is read.  Again, many if not all of the

documents responsive to these specifications may be non-public and thus inadmissible for

purposes of summary judgment if the California district court adopts the reading of McCreary

County urged by the Members and the Secretary.  But to declare such documents irrelevant at the

discovery stage would deprive the JWV plaintiffs of the chance to use the information obtained

should the California district court reject that reading, or should the JWV plaintiffs succeed in

the current battle over the propriety of deposing Charles LiMandri, an attorney for the Thomas

More Law Center.[8]  See Trunk v. City of San Diego, Civ. A. No. 06-1597 (S.D. Cal.) (Dkt. #137,

146, 148, 149, 152, 153).  The Court therefore concludes that documents responsive to

---

[7] The Members' Speech or Debate privilege claim as to these responsive documents is examined infra.

[8] In the event that LiMandri is deposed, documents responsive to specification 3 -- and in particular those capturing the Members' contacts with the Thomas More Law Center -- will undoubtedly assist the JWV plaintiffs in formulating questions designed to elicit responses that are themselves relevant and admissible at the summary judgment stage.

31

specifications 3, 5, 7 and 9 are relevant under Rule 26(b).

In ruling that the Members and the Secretary have not carried their "burden of showing why discovery should not be allowed," see Doe v. District of Columbia, 231 F.R.D. 27, 30 (D.D.C. 2005), the Court is aware of and sensitive to the concerns raised by the Members as to the breadth of the discovery sought. The Members worry that a ruling in favor of JWV would stretch the "historical context" and "specific sequence of events" leading to a statute or a religious display far beyond what the Supreme Court meant by those terms. Members' Post-Hearing Reply at 6-7. They thus fear that the Court's decision will establish "a precedent that has very disturbing and far-reaching implications." Id. at 7. After careful consideration, however, the Court finds these concerns unjustified for several reasons.

*First*, there is simply no evidence that the JWV plaintiffs constitute the tip of an iceberg of Establishment Clause litigants seeking documentary discovery from U.S. Congressmen. The Members and the Secretary have collectively identified only one other instance -- worthy of mention in a footnote, at that -- in which a court has addressed the propriety of questioning legislators in the Establishment Clause setting. See May v. Cooperman, 572 F. Supp. 1561, 1564 n.2 (D. N.J. 1983) (explaining earlier ruling refusing to permit depositions of state legislators who supported New Jersey moment-of-silence law). This dearth of authority persists despite the recognition in the very cases cited by the Members that challenges under the Establishment Clause comprise an exception "to the principle that judicial inquiry into legislative motive is to be avoided." See South Carolina Educ. Ass'n v. Campbell, 883 F.2d 1251, 1259 (4th Cir. 1989). Nor is there any reason to suspect that these or other plaintiffs will routinely seek discovery from every legislator who supported a statute -- a practice the Members believe to be the logical

outcome of JWV's position.  Members' Opp'n at 12.  Even were such a fear justified,

Congressmen Hunter, Issa, and Bilbray can hardly be equated with the run-of-the-mill legislator

who votes for a statute.  These Members in particular had every reason to suspect that their words

and deeds as the Act's sponsors would be the subject of post-enactment scrutiny; they played a

high-profile role in the federal government's acquisition of a large Latin cross that had been the

subject of extensive prior litigation, made numerous public statements, and boasted of their role

in campaign literature.  The Members were therefore obvious sources uniquely positioned to

provide information on the course of events that culminated in federal legislation and the transfer

of the Memorial to federal control.  This Court's case-specific ruling allowing discovery from

these three Members neither works an injustice to them nor opens a proverbial can of worms for

legislators generally.

  *Second*, to the extent that discovery requests directed at Members do proliferate, the

Federal Rules of Civil Procedure, and presumably the House rules as well, provide sufficient

protection.  Rules 26(b) and 45 of the Federal Rules of Civil Procedure offer numerous grounds

on which a party served with a discovery request can object or move to quash.  The Members

invoked some of these very provisions in their initial objections to the subpoenas, contending

that the subpoenas were "unreasonably vague and overbroad," that the requested discovery was

"unreasonably cumulative and duplicative," and that the information sought was "obtainable from

other sources that are more convenient and less burdensome."  Members' Opp'n, Exh. MC9.  But

the Members have not pressed these objections in this litigation, including in their papers only a

boilerplate exposition of the latter argument.  Indeed, their counsel recognized at the motions

hearing that the subpoenas did not impose a heavy burden.  Documents in Representative

Hunter's possession responsive to the nine specifications filled one banker's box, while those held

by Congressmen Issa and Bilbray combined filled only an expandable file folder.  Preliminary

Transcript of Motions Hearing ("Prelim. Tr.") at 71.

  *Third*, the protections that the federal and House rules provide are supplemented by those

that the Constitution's Speech or Debate Clause affords.  These additional safeguards, whose

contours are discussed at length below, include a "testimonial privilege [that] extends to non-

disclosure of written legislative materials."  United States v. Rayburn House Office Bldg., -- F.3d

--, 2007 WL 2275237, at *1 (D.C. Cir. Aug. 3, 2007).  The Constitution itself thus assures that

federal legislators need not turn over to private litigants or to the Executive Branch documents

that reflect legislative acts.  See id. at *6.  Critically, however, the relevance and Speech or

Debate inquiries remain separate ones, such that the Clause does not alter the substantive content

of the relevance standard.  Counsel for the Secretary acknowledged as much at the motions

hearing, Prelim. Tr. at 32, and with good reason.  After all, had JWV sought the requested

documents from other sources -- i.e., had subpoenas been directed at the various organizations

listed in specification 3 -- the same relevance standard would apply.  Another way of putting this

is that the Speech or Debate Clause provides independent protection, but does not heighten the

showing a party must make to establish the relevance of proposed discovery.  Cf. United

Transportation Union v. Springfield Terminal Rwy. Co., 132 F.R.D. 4, 7 (D. Me. 1990) (applying

Rule 26(b)'s "broad" standard to requests for production from U.S. Senator in case where Speech

or Debate privilege also raised).

  The fact that the standard for relevance remains the same regardless of the identity of the

recipient of the subpoena leads to a *fourth* and final reason for rejecting the Members' concerns --

namely, that their position is no less extreme than the one urged by the JWV plaintiffs. At

bottom, the Members' view that only "openly available data" is relevant (and hence available in

discovery) to show an impermissible legislative purpose or a primarily religious effect means that

no -- or almost no -- discovery will be available to parties pursuing an Establishment Clause

challenge. It is easy to see why. If "openly available" boils down to "public," then the

challenging party should already have either access to all of the "relevant" materials or at least a

means of obtaining them that is less burdensome than formal discovery. This leaves only

documents that, although not public themselves, are likely to lead to public materials. But to the

extent this category exists at all, it will be exceedingly narrow. The Members thus gain little

traction by pointing to the drastic consequences of allowing discovery against them when their

position, under the guise of protecting legislators from an onslaught of invasive subpoenas,

portends virtually no discovery at all on the issues of purpose and effect critical to the

Establishment Clause inquiry.

## C. Speech or Debate Clause

Having concluded that documents responsive to all of the specifications are relevant for

purposes of Fed. R. Civ. P. 26(b) and House Rule VIII, the Court must now decide whether the

Speech or Debate Clause of the Constitution protects the Members from producing documents

responsive to four of the specifications. Unlike in the relevance area, the parties begin on

common ground. They agree that the subpoenas are not intended to cover, and that the JWV

plaintiffs are not entitled to, "intralegislative communications regarding the drafting, proposal,

discussion, or negotiation of legislation." JWV Mem. at 28; Members' Opp'n at 19. The two

sides also agree that inter- and intra-office communications regarding "non-legislative matters"

are not protected. Id.; JWV Reply at 18 n.7. Moreover, the Members do not raise the Clause as a bar to producing documents responsive to specifications 1, 2, 4 and 6. This Court's task is therefore to decide only whether specifications 3, 5, 7 and 9 seek documents that fall within the Clause's ambit.

The starting point is the text of the Speech or Debate Clause, which states that "for any Speech or Debate in Either House," Senators and Representatives "shall not be questioned in any other Place." U.S. Const., art. I, § 6, cl. 1. Although this language by its terms covers only verbal statements pronounced on the floor of one of the Houses, the Supreme Court has long interpreted the Clause to provide more protection than that. The Court's cases "indicate that the legislative privilege will be read broadly to effectuate its purposes," which are to "ensur[e] the independence of the legislature" and to "reinforc[e] the separation of powers so deliberately established by the Founders." United States v. Johnson, 383 U.S. 169, 178-80 (1966). Where the Clause applies, the immunity that it confers is absolute, Eastland v. United States Servicemen's Fund, 421 U.S. 491, 508 (1975), meaning that the Clause bars both criminal and civil liability, see Doe v. McMillan, 412 U.S. 306, 311-12 (1973). It also affords a testimonial (or "non-disclosure") privilege pursuant to which Members cannot be required either to produce documents or to answer questions, whether in a deposition or on the witness stand. Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 418 (D.C. Cir. 1995); see also Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 14 (D.C. Cir. 2006) (en banc) (Opinion of Randolph, J.), appeal dismissed and cert. denied sub nom. Office of Senator Mark Dayton v. Hanson, 127 S. Ct. 2018 (2007).

The "broad" reading given to the Clause is not, however, boundless. To the contrary, the

Supreme Court has held, and the D.C. Circuit has reaffirmed, that the immunity conferred by the Clause is "not all-encompassing." Gravel v. United States, 408 U.S. 606, 625 (1972); Walker v. Jones, 733 F.2d 923, 929 (D.C. Cir. 1984). The Clause's coverage is primarily twofold: it "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.'" United States v. Helstoski, 442 U.S. 477, 489 (1979) (quoting United States v. Brewster, 408 U.S. 501, 525 (1972)). "Legislative acts," the Court explained in Gravel, consist of matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." 408 U.S. at 625. While this legislative-acts limitation has been phrased in various ways throughout the Supreme Court's key decisions in this area, one constant in those decisions is a refusal to "treat[] the Clause as protecting all conduct relating to the legislative process." Brewster, 408 U.S. at 515; see also Hutchinson v. Proxmire, 443 U.S 111, 131 (1979).

What, then, are the legislative acts protected by the Speech or Debate Clause? The D.C. Circuit recently enumerated the following nonexhaustive list: "The legislative process at the least includes delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and introducing material at Committee hearings." Fields, 459 F.3d at 10-11 (Opinion of Randolph, J.) (citations, quotation marks, and footnotes omitted). Because it is nonexhaustive, this list omits other acts that are indisputably legislative in nature, such as the actual drafting of legislation or negotiating with

other Members over it.  See Prelim. Tr. at 62.

Just as important is the corollary question of which actions by Members do not qualify as legislative acts under current case law.  Members of Congress, the Supreme Court has recognized, engage in many activities that do not lead directly to legislation.  These activities, which are "political in nature rather than legislative," "include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."  Brewster, 408 U.S. at 512.  Although these activities are important and might even "be integral to a Member's legislative goals," they are nevertheless considered "political" and thus beyond the coverage of the Speech or Debate Clause. See Fields, 459 F.3d at 12.

The list of activities that are legitimate yet "political" starts (rather than ends) with Brewster.  Courts have gone on since then to exclude other types of conduct from the Clause's coverage.  Thus, the Supreme Court applied Brewster in rejecting the notion that Congress has an "informing function," instead holding that potentially defamatory newsletters and press releases issued by a fiscally conscious Senator were not protected by the Clause.  Hutchinson, 443 U.S. at 132-33.  The Court also suggested in that case that, even if a Member's call to a government agency seeking information were a protected activity, contacting an executive agency in order to influence its conduct is not.  Id. at 121 n.10; accord Gravel, 408 U.S. at 625 (explaining that Members' contacts with Executive Branch officials to "cajole" or "exhort [them] with respect to the administration of a federal statute" does not qualify as "protected legislative activity," even "though generally done"); Johnson, 383 U.S. at 172 (suggesting that the Clause did not cover a

38

Member's "attempt to influence the Department of Justice"); <u>Chastain v. Sundquist</u>, 833 F.2d

311, 314-15 (D.C. Cir. 1987) (Congressman's letters to the Attorney General were "not shielded

by the Clause" because they "did not seek information or otherwise attempt to aid a congressional

investigation").  Since <u>Hutchinson</u>, the D.C. Circuit has held that personnel decisions "taken in

the course of managing congressional food service facilities" are not protected by the Clause,

<u>Walker</u>, 733 F.2d at 925, and that, while the Clause "may preclude some relevant evidence," it

does not categorically bar suits for employment discrimination under the Congressional

Accountability Act, <u>Fields</u>, 459 F.3d at 13-14.

      These precedents provide the background for the Members' specific claims of Speech or

Debate privilege in this case.  The Members maintain that the Speech or Debate Clause allows

them to resist producing the documents sought in specifications 3, 5, 7 and 9.  Those requests,

the Members contend, need not be answered because the Clause (1) protects information

gathered by the Members in advance of proposing legislation, (2) bars inquiry into the Members'

motivations for sponsoring the Act, and (3) applies fully to "preparations for legislative activities

such as meetings, hearing, speeches and the like."  Members' Opp'n at 24-27.  JWV counters that

informal information gathering -- as opposed to formal legislative inquiry -- does not fall within

the Clause's ambit; that the specifications at issue seek information on legislative purpose, not the

motives of individual Members; and that even if some of the documents requested are privileged,

others unquestionably are not and must be disclosed.

      There is some merit to the contentions of both sides.  The Members are correct that, under

the law of this and other circuits, informal information gathering in connection with or in aid of a

legitimate legislative act is itself protected by the Speech or Debate Clause.  Such information

gathering may take the form of communications with organizations, constituents, or officials of a coordinate branch. The Members are likewise correct that the Clause prohibits inquiry into an individual legislator's motives for engaging in particular legislative acts. At the same time, JWV is correct that accepting the Members' position on these points does not necessarily shield from production all documents responsive to specifications 3, 5, 7 and 9. Documents that reflect a Member's efforts to persuade Executive Branch officials to use existing statutory authority, for example, must be produced, as must documents that reflect legislative purpose, rather than the motives of individual legislators. The bases for and contours of these and related conclusions are explained further below.

### 1. Informal Information Gathering

Congress's efforts to acquire information during committee investigations or through the issuance of subpoenas constitute legislative acts protected by the Speech or Debate Clause. See Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504 (1975). The Supreme Court has never directly addressed, however, whether the Clause covers informal information gathering by Members or their staff. Not surprisingly, lower federal courts are divided on the question. JWV points to dictum in Hutchinson, 443 U.S. at 132, as suggesting that the Clause does not protect information obtained via less formal methods and as part of a Member's personal agenda. But Hutchinson is not on point. In that case, the issue was whether newsletters and press releases allegedly issued as part of Congress's "informing function" were protected by Clause. In holding that they were not, the Court distinguished between two "uses of the term 'informing'": Congress informing itself, and a Member informing the public. Id. The Court concluded that the term described "congressional efforts to learn of the activities of the Executive Branch and

administrative agencies," rather than "wide-ranging inquiries by individual Members on subjects

of their choice."  Id.  In other words, while Congress's efforts to apprise itself of governmental

affairs were protected, an individual Member's public dissemination of information that

interested him was not.

      Building upon Hutchinson's dictum, the Tenth Circuit has held that the Speech or Debate

Clause does not cover "informal information gathering -- either personally by a member of

Congress or by congressional aides."  Bastien v. Office of Campbell, 390 F.3d 1301, 1316 (10th

Cir. 2004), cert. denied, 126 S. Ct. 396 (2005).  This holding, however, conflicts with decisions

of the Third and Ninth Circuits.  See Gov't of Virgin Islands v. Lee, 775 F.2d 514, 521 (3d Cir.

1985) (legislative immunity applies to "fact-finding, information gathering, and investigative

activities[, which] are essential prerequisites to the drafting of bills and the enlightened debate

over proposed legislation"); Miller v. Transamerican Press, Inc., 709 F.2d 524, 530 (9th Cir.

1983) ("Obtaining information pertinent to potential legislation or investigation is one of the

'things generally done in a session of the House' concerning matters within the 'legitimate

legislative sphere.'") (citations omitted).  What is more, Bastien cannot be reconciled with earlier

D.C. Circuit precedents that are binding on this Court.

      Among those precedents is McSurely v. McClellan, 553 F.2d 1277 (D.C. Cir. 1976) (en

banc), which has been described as "one of the most definitive cases treating the subject of

legislative immunity."  Benford v. Am. Broadcasting Co., 102 F.R.D. 208, 210 (D. Md. 1984).

Although the ten-member en banc court in McSurely divided evenly over the resolution of one

key issue, the court was unanimous in endorsing the proposition that "'[t]he acquisition of

knowledge through informal sources is a necessary concomitant of legislative conduct and thus

should be within the ambit of the privilege so that congressmen are able to discharge their

constitutional duties properly.'" Id. at 1287 (Opinion of Leventhal, J.) (citation omitted); id. at

1303 n.3 (Wilkey, J., dissenting in part) (agreeing with the principle that "investigative activity is

so essential to the legislative process that it is ordinarily absolutely privileged").  Courts in this

district and elsewhere have read McSurely as establishing the quoted proposition notwithstanding

the dictum in Hutchinson.  See Webster v. Sun Co., Inc., 561 F. Supp. 1184, 1189 (D.D.C.

1983), vacated on other grounds, 731 F.2d 1 (D.C. Cir. 1984); Tavoulareas v. Pito, 527 F. Supp.

676, 680 (D.D.C. 1981); see also Benford, 102 F.R.D. at 210.  One court even extrapolated from

McSurely a dividing line between "active acquisition of information by congressional staff" and

"the passive receipt of information provided by an outside source at the source's own election."

Tavoulareas, 527 F. Supp. at 680.  Whereas the Clause was held to safeguard the former

category, its protections did not extend to the "passive receipt of information." Id.

The distinction drawn in Tavoulareas, however, has been expressly rejected by the Ninth

Circuit and implicitly overruled in a controlling D.C. Circuit decision.  See Brown & Williamson

Tobacco Corp. v. Williams, 62 F.3d 408, 421 (D.C. Cir. 1995); Miller, 709 F.2d at 530-31.  In

Brown & Williamson, a company served subpoenas on two Congressmen whose subcommittee

was investigating the effects of tobacco products.  The subcommittee had received documents

stolen from the office of a law firm representing the company, and the company sought to

reclaim the materials.  62 F.3d at 412.  In affirming the district court's decision to quash the

subpoenas, the D.C. Circuit held that the Speech or Debate Clause includes a non-disclosure

privilege that is coextensive with the bar against suing Congressmen for their legislative acts.  Id.

at 420-21.  "[D]ocuments or other material that comes into the hands of congressmen may be

reached either in a direct suit or a subpoena," the court explained, "only if the circumstances by which they come can be thought to fall outside 'legislative acts' or the legitimate legislative sphere." Id. at 421. That the Congressmen's receipt of the documents had unquestionably been "passive," to use the Tavoulareas court's term, neither changed the constitutional calculus nor altered the court's conclusion that the subpoenas were barred by the Speech or Debate Clause. Id. at 421-22. In other words, the informality or passivity of the method through which Congress acquired the information did not lessen or negate the applicability of the Clause's protections.

To be sure, JWV is correct that the documents in Brown & Williamson were acquired in connection with an ongoing -- and ostensibly "formal" -- investigation being conducted by the House subcommittee. JWV Reply at 23. A similar point could be made about the Fourth Circuit's decision in United States v. Dowdy, 479 F.2d 213 (4th Cir. 1973), cited repeatedly by the Members. There, the court held that a Congressman's acceptance of documents from and conversations with federal agencies constituted protected legislative acts and could not form the basis for overt acts included in a criminal indictment. Id. at 223-24. But the Congressman's efforts in Dowdy to collect information were not completely informal because he too had received the documents in "preparation for a subcommittee hearing." Id. at 223. From these cases and Bastien, JWV argues that the status of informal information gathering remains unsettled and that, despite Brown & Williamson, the D.C. Circuit has not squarely held that "all information gathering in furtherance of current or even planned legislative activities" is protected by the Clause. JWV Reply at 23.

The distinction that JWV seeks to draw is illusory and does not follow from the case law in this circuit. For one thing, at the end of every protected information-gathering venture is a

legislative act that could in some sense be deemed "formal": a piece of draft legislation, a hearing before or investigation by a committee, a meeting to help push through a pending bill. The terms "formal" and "informal" refer only to the method by or through which information is acquired. Cf. McSurely, 553 F.2d at 1286 (equating information gathered "by issuance of subpoenas" with information gathered via "field work by a Senator or his staff") (Opinion of Leventhal, J.). Put another way, neither "method" warrants protected status unless the information is being gathered as part of, in connection with, or in aid of a legitimate legislative act. See Benson, 102 F.R.D. at 210 (observing that "information-gathering in aid of the legislative process" constitutes a "legitimate legislative function[]"). JWV's position is also beset by practical problems. As the Members persuasively point out, Congressmen and Senators do not mark information pertaining to an area of legislative interest as "formally gathered" or "informally gathered." Prelim. Tr. at 67. It is hard enough to draw the crucial distinction between legislative and non-legislative acts, despite the existence of four decades of Supreme Court and D.C. Circuit case law to provide guidance. Subdividing the universe of information based on the method through which such information is acquired threatens further to obscure this already muddled area and to render the line drawn unworkable. Much the same problem, it will be recalled, doomed the Tavoulareas court's distinction between active acquisition and passive receipt. See Miller, 709 F.2d at 530. In the end, the Court finds misplaced the focus on the formality or informality of methods used to acquire information. The controlling principle is instead that a Member's gathering of information beyond the formal investigative setting is protected by the Speech or Debate Clause so long as the information is acquired in connection with or in aid of an activity that qualifies as "legislative" in nature. See Brown & Williamson, 62 F.3d at 419; Benson, 102 F.R.D. at 210.

*2. Application to Specifications 3, 5, 7 and 9*

How, then, does the protection afforded information gathering apply to the four specifications in JWV's subpoenas as to which a Speech or Debate Clause objection is interposed?  According to the Members, the responsive documents include "historical materials; press clippings; memoranda; communications between Members (and/or their staffs) and the executive branch, the City of San Diego, other constituents, and interested organizations or members of the public about the legislation, legislative strategies, and the like."  Members' Opp'n at 24.  The foregoing discussion suggests that the Clause's "non-disclosure privilege" will shield many of these responsive documents from production.  See United States v. Rayburn House Office Bldg., -- F.3d --, 2007 WL 2275237, at *5 (D.C. Cir. Aug. 3, 2007); Brown & Williamson, 62 F.3d at 420.  The Members indisputably engaged in a series of legislative acts, the most obvious of which stem from their sponsorship of H.R. 5683.  To the extent that their communications, discussions, or other contacts with the organizations listed in specification 3 constitute information gathering in connection with or in aid of those legislative acts, they are protected by the Speech or Debate Clause and need not be disclosed.

On the other hand, it is hard to imagine that every one of the contacts and communications covered by specification 3 qualifies as information gathering in connection with or in aid of the legislative acts alluded to by the Members.  As JWV points out, neither H.R. 5683 nor its Senate counterpart was a complex bill that required intensive fact-finding or investigation, especially since they followed closely on the heels of legislation that then-Representative Cunningham had pursued on the same subject in late 2004.  JWV Reply at 24.  Moreover, the Members engaged in various Mt. Soledad-related activities that were political

rather than legislative in nature, including media appearances and "speeches delivered outside the Congress." See Brewster, 408 U.S. at 512. These actions are more likely to be reflected in the non-privileged documents responsive to specifications 1 and 2. But if documents responsive to specification 3 also capture such political activities, they may well be beyond the purview of the Speech or Debate Clause and hence must be produced. In short, documents generated as part of or reflecting the Members' political (as opposed to legislative) activities may not be covered by the Clause.

Whether specifications 5 and 7 seek protected documents turns on the Speech or Debate Clause's application to contacts between Members and the Executive Branch. The Members concede that the Supreme Court has repeatedly stated that the Clause does not protect certain types of interbranch contacts, such as a Member's "making of appointments with Government agencies," Brewster, 412 U.S. at 512; efforts "to influence the Executive Branch," Doe, 412 U.S. at 313; or attempts to "cajole" or "exhort with respect to the administration of a[n existing] federal statute," Gravel, 408 U.S. at 625. Again, these examples strongly suggest that some documents responsive to specifications 5 and 7 will not be protected by the Speech or Debate Clause. The clear target of both specifications 5 and 7, as JWV makes plain in its reply, are documents that chronicle the Members' efforts in early 2006 to persuade Executive Branch officials to take possession of the cross under existing statutory authority. JWV Reply at 20. Insofar as documents responsive to specification 7 capture the Members' efforts to influence whether -- and the manner in which -- Executive Branch officials used existing statutory authority, those documents are not protected and must be produced. See Gravel, 408 U.S. at 625; Johnson, 383 U.S. at 172; Chastain v. Sundquist, 833 F.2d 311, 314-15 (D.C. Cir. 1987).

Likewise, scheduling meetings at which the Members (or representatives of interest groups) could "cajole" or "exhort" Executive Branch officials to take such action is not a "legislative act" protected by the Speech or Debate Clause.  See Gravel, 408 U.S. at 625; Brewster, 408 U.S. at 512.  Documents responsive to specification 5 that fit this description must therefore also be produced.

The Members counter that the Supreme Court's exclusion of some Member-Executive Branch contacts from the Clause's coverage does not mean that all such contacts are unprotected. Members' Opp'n at 29.  Were that the case, the argument goes, the Hutchinson Court would not have left open the possibility that the Clause "protect[s a Member's] calls to federal agencies seeking information," Hutchinson, 443 U.S. at 121 n.10, and Justice Stewart would not have separately noted his view that "telephone calls to federal agency officials are a routine and essential part of congressional oversight" and are accordingly protected legislative activities.  Id. at 136.  The Members' position also finds some support in Chastain, 833 F.2d at 314-15.  There, the D.C. Circuit held that a Congressman's letter to the Attorney General urging an investigation of a Memphis attorney was not protected by the Clause.  "The letter[]," the court explained, "did not seek information or otherwise attempt to aid a congressional investigation," but was instead an "attempt[] to influence the conduct of federal agencies."  Id. at 315.  The implication of this reasoning, the Members assert, is that the contacts with the Attorney General would have been protected had the Congressman been seeking information instead of trying to exert influence. They cite Dowdy as further support for this view.  In that case, the Member requested a meeting and later met with an Assistant U.S. Attorney, met with officials from two executive agencies, and received documents from those officials.  479 F.2d at 223.  The Fourth Circuit held that such

47

actions, conducted in preparation for a hearing of the subcommittee chaired by the Member, were legislative in nature.  Id.  Taken together, then, these authorities support the Members' contention that not all contacts and communications between Members and the Executive Branch are unprotected.

These authorities do not, however, allow the Court to draw a bright line between protected and unprotected Member-Executive Branch contacts that will apply across the board. The Members will instead have to proceed cautiously, keeping in mind what the Supreme Court and the D.C. Circuit have held are not protected contacts or communications.  It may be the case that a document such as Congressman Hunter's May 10, 2006 letter to President Bush (JWV Reply, Exh. 1) encouraging him to initiate condemnation proceedings is not protected by the Clause, while later correspondence inquiring into the President's decision and hence the need for new legislation may constitute protected information gathering in connection with prospective legislation.  Both documents would be responsive to specification 7, but only the former may have to be produced.  In the end, the focus should remain on whether a Member's activities are legislative in nature.  The Members must bear in mind that some of their contacts with the Executive Branch are plainly beyond the Clause's coverage, and JWV must understand that drafting, proposing, and securing support for a bill are core legislative activities that may involve and sometimes require contacts with Executive officials.  These activities do not lose their legislative character simply because employees of the Executive Branch are involved.

That brings us to specification 9, which seeks the production of documents concerning or relating to the Member' contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.  Neither JWV nor the

Members have pointed to cases addressing a federal legislator's contacts with local government officials. JWV treats these contacts as identical (or at least) analogous to communications between a Member and Executive Branch officials. JWV Mem. at 26-27. The Members, in contrast, appear to view the contacts as paralleling those with constituents or other groups. Members' Opp'n at 30. The Court need not choose between these two options, since the Speech or Debate Clause's application turns on the activity at issue, not the identity of the party with which the Member comes in contact. There could be some responsive documents that capture the Members' efforts to stay apprised of the ever-shifting status of the Mt. Soledad Memorial. Such documents may in some instances be protected as information gathered in aid of or in connection with legislative acts, including the preparation and sponsorship of the 2006 legislation itself. As with specification 3, however, other documents may pertain to political rallies, media and campaign appearances, or other matters that are not legislative in nature under controlling precedent. Those documents would of course have to be produced.

### 3. Legislators' Motives

One of the Members' arguments applies to all four of the specifications and overlaps with the discussion of "purpose" under the Establishment Clause. Pointing to the settled rule that the Speech or Debate Clause bars inquiry into a Member's "motivations" for legislative acts -- as opposed to legislative purpose -- the Members contend that the information sought by JWV "necessarily reflects the Members' motivations for drafting, sponsoring and pushing for passage of H.R. 5683," and is thus "off limits." Members' Opp'n at 26-27 (citing, among other cases, Brewster, 408 U.S. at 525, and Dowdy, 479 F.2d at 226). But JWV persuasively counters that the Members have fallen into the very trap of which they accuse JWV in the Establishment

Clause context: conflating an individual legislator's "motivations" for proposing legislation with the overall legislative purpose. JWV Reply at 24. The specifications at issue, JWV clarifies, "are focused on ascertaining the <u>purpose</u> of the Act -- i.e., whether Congress' intended outcome was preservation of a religious symbol or honoring of veterans." <u>Id.</u> at 25. After all, there may be a difference between why an individual Member sponsored or supported a bill and what that bill was designed to accomplish. <u>See, e.g.</u>, <u>Brown v. Gilmore</u>, Civ. A. No. 00-1044-A, 2000 U.S. Dist. LEXIS 21623, at *20 (E.D. Va. Oct. 26, 2000) ("There is an important difference between the motive and purposes of individual legislators and institutional legislative purpose."), <u>aff'd</u>, 258 F.3d 265 (4th Cir. 2001). A document that says, "this legislation is intended to free the display from the restrictions of the state constitution," for instance, is not the same as one that proclaims, "I am introducing this bill because I believe religious symbols should be allowed on public land." The former may illustrate the legislature's purpose, while the latter captures the motivations of an individual legislator. This distinction is admittedly a fine one that may disappear in practice and that can be difficult to apply on a document-by-document basis. It is nevertheless a distinction that finds support in the case law, <u>e.g.</u>, <u>id.</u>; <u>Glassroth v. Moore</u>, 229 F. Supp. 2d 1290, 1216 (M.D. Ala. 2002), <u>aff'd</u>, 335 F.3d 1282 (11th Cir. 2003), and hence must be respected here.

The Members' failure to appreciate this distinction may make their argument overbroad, but it does not necessarily render their objection meritless, as JWV urges. In sponsoring (or co-sponsoring) H.R. 5683, the Members engaged in a number of acts that even JWV concedes were legislative in nature and therefore protected. Inquiry into individual Members' "motivations" for engaging in these protected acts is prohibited, even if those motivations are "unworthy" or

improper.  See Eastland, 421 U.S. at 508; Brewster, 408 U.S. at 525.  Hence, there may be responsive documents (or portions thereof) that reflect the three Members' motivations but that need not be disclosed to the JWV plaintiffs.  The question then becomes how to avoid disclosure of the Members' motivations for particular legislative acts without denying the JWV plaintiffs access to documents (or portions thereof) dealing with overall legislative purpose that are both relevant and not covered by the Speech or Debate Clause.  It is to this question and other related concerns that the Court now turns as a final matter.

### 4.  Further Review

The general principles and case-specific assessment sketched above provide a framework for deciding which of the documents responsive to specifications 3, 5, 7 and 9 are protected by the Speech or Debate Clause.  These principles do not, however, establish the brightest of lines, leaving room for disagreement as to which documents must be disclosed.  This leads to the obvious question of who makes that decision.  As the Members see it, they do.  Document-by-document judicial review of materials potentially protected by the Clause is not permitted, they contend, because it would contravene Brown & Williamson's non-disclosure privilege.  Members' Surreply at 6.[9]  And even were such review permitted, the Members argue, that is not how these disputes are typically resolved, in large part because courts are not equipped to determine from the face of a document whether it reflects a legislative act.  Id. at 9-11.  JWV naturally responds that Brown & Williamson neither bars judicial resolution of Speech or Debate disputes nor absolves the Members of the responsibility of compiling a privilege log.  In support,

---

[9] In the Order accompanying this Memorandum Opinion, the Court grants the Members' pending motion for leave to file a surreply.

JWV cites one case from this district rejecting the position that the Speech or Debate Clause bars "document-by-document review by the judiciary," In re Search of The Rayburn House Office Building Room Number 2113, 432 F. Supp. 2d 100, 115 (D.D.C. 2006), rev'd on other grounds, -- F.3d --, 2007 WL 2275237 (D.C. Cir. Aug. 3, 2007), and another case ordering an in camera hearing to determine whether the Member's documents were in fact legislative in nature, In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F. Supp. 211, 214 (D.D.C. 1980). See JWV Reply at 21 n.11.

Each side is once again correct in part. As an initial matter, the D.C. Circuit's most recent decision in this area indicates that the Members read Brown & Williamson too broadly. See Rayburn House Office Bldg., -- F.3d --, 2007 WL 2275237, at *5. The Rayburn case involved the search and retention of documents from the office of sitting Congressman William Jefferson pursuant to a search warrant. Jefferson sought the return of the seized materials, contending that the search violated the Speech or Debate Clause. The district court denied his motion. 432 F. Supp. 2d at 119. Jefferson then sought emergency relief in the D.C. Circuit, which entered an order enjoining the United States from resuming its review of the seized materials pending Jefferson's appeal. Rayburn House Office Bldg., -- F.3d --, 2007 WL 2275237, at *3. The order sent the case back to the district court with instructions to permit Jefferson to assert legislative privilege over specific documents. Critically, the order contemplated that, once the district court had provided copies of the seized materials to Jefferson and he had made his privilege claims, the district court would "'review in camera any specific documents or records identified as legislative and make findings regarding whether the specific documents or records are legislative in nature.'" Id. (quoting Remand Order). Although the D.C. Circuit eventually ruled in part for Jefferson, it

never called into question the propriety of the remand procedures previously mandated.  To the contrary, the court of appeals' ruling depended on those procedures being the proper ones. Jefferson was entitled, the court held, to the return of only those materials that the district court "in the first instance determine[s] pursuant to the Remand Order . . . are privileged legislative materials under the Speech or Debate Clause."  Id. at *10.  The district court, then, and not the Congressman, would ultimately decide whether specific documents are legislative in nature.

Perhaps anticipating the D.C. Circuit's decision, the Members urge a distinction between the serious criminal prosecution at issue in Rayburn and the "garden variety duces tecum subpoena" at issue here.  Members' Surreply at 10.  This is precisely the distinction drawn by Judge Henderson in her Rayburn concurrence.  -- F.3d --, 2007 WL 2275237, at *14.  Her view did not, however, carry the day, and the majority instead extended Brown & Williamson to the criminal sphere.  Id. at *6.  In so doing, the majority necessarily believed that the judicial review contemplated by the Remand Order was consistent with, if not compelled by, Brown & Williamson.  The D.C. Circuit's reading in Rayburn of Brown & Williamson, and its explicit approval of a procedure through which the district court evaluates claims of legislative privilege on a document-by-document basis, sinks the Members' contention that the Constitution categorically bars courts from deciding whether individual documents are legislative in nature, and hence within the ambit of the Speech or Debate Clause.

Nevertheless, the Members are correct that judicial resolution of claims of legislative privilege is a last resort, not a first step.  This order of operation best serves the principal purposes underlying the Speech or Debate Clause -- ensuring legislative independence and preserving the separation of powers.  See United States v. Johnson, 383 U.S. 169, 178-80 (1966).

Cutting in the same direction are the practical problems posed by judicial review. In camera review imposes substantial burdens on both the Members and the courts, while the ex parte nature of proceedings eliminates much of the efficacy of the adversarial system. Nor would in camera review be a straightforward endeavor. The Members represent that even the House and Senate counsel often struggle to determine whether documents memorialize or reflect legislative acts, a fact that hints at the difficulty of the task that this Court would face were it to undertake a similar review. Members' Surreply at 11 & n.5.

In light of these difficulties and the sensitive constitutional interests at stake, the Court will entrust the Members with the initial -- and perhaps the ultimate -- responsibility of applying the principles set forth in this Memorandum Opinion to specifications 3, 5, 7 and 9 of the subpoenas. The Court does so with the expectation that the Members will honor their commitment to producing documents that are "relevant and not privileged," and with the hope that "supervis[ing] the Members' production of documents" will be unnecessary. See Members' Reply at 2. Should these hopes be dashed, the Court keeps open the possibility of conducting a review of the documents in accordance with either the procedure set forth in Rayburn or another procedure that is acceptable to the parties and consistent with the Speech or Debate Clause.


## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part JWV's motions to compel in Misc. Nos. 07-220, 07-221, and 07-222. A separate order has been issued herewith.

    /s/ John D. Bates    
JOHN  D. BATES
United States District Judge

Dated:   September 18, 2007